# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| | ) | Case No. 8:10CR259 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | FINDINGS AND |
| FRANCISCO HEREDIA-BARRAZA, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This case is before the court on the defendant's Motion to Suppress Evidence (#19). Hearings were held on November 10, 2010 (#32) and December 7, 2010 (#38). The motion was taken under advisement and was submitted for decision on December 10, 2010, upon the filing of all hearing transcripts.

The defendant, Francisco Heredia-Barraza, moves the court for an order (1) suppressing any inculpatory evidence and investigatory fruits of a stop of a Volkswagen Jetta in which he was a passenger on June 15, 2010; (2) suppressing any inculpatory evidence obtained as the result of his arrest and the search of his person and Pontiac vehicle on June 17, 2010; and (3) suppressing a statement made by him to law enforcement on June 17, 2010.

The government counters in its brief that the June 15 stop of the vehicle was based upon probable cause that a traffic violation occurred, the June 17 arrest of the defendant was based on probable cause, and the statement he made on June 17 to law enforcement was voluntary and not in response to questions.

## I. FACTUAL FINDINGS

Mark Majewicz testified he is currently employed by the Omaha Police Department. On June 15, 2010 he was conducting surveillance of a pickup truck involved in narcotics transactions (3:3-8). The target of the narcotics investigation was codefendant Gabriel Sauceda (3:9-11).

As he followed the pickup in the area of 41st and R Streets, Majewicz observed the driver exit the pickup and enter the back seat of a silver Volkswagen Jetta with no license plates (3:7-21). Majewicz realized that there was someone in the driver's seat of the Jetta, but he could not see how many persons were in the Jetta. By police radio traffic, Majewicz was ordered to follow the Jetta. He observed the Jetta travel northbound on 42nd to about F Street where it turned into a gas station. He observed the driver pumping gas and make contact with an unknown female in a black Nissan (4:11-20). Majewicz reported his information over the radio and continued to watch the vehicles until both the Jetta and the Nissan left.

The Jetta traveled northbound on 42nd towards I-80 and the Nissan traveled southbound on 42nd towards L Street. Majewicz followed the Nissan and Officer Laney followed the Jetta. Later, Majewicz again began following the Jetta (6:1-2). He had followed the Jetta until it left the gas station, at approximately 12:15 p.m. Majewicz began following the Jetta again at around 1:08 p.m., when the Jetta was observed at 60th and I-80, near F Street (6:8-17).

On cross-examination Majewicz testified that the Jetta did not have plates but he believed it had in-transit stickers in the lower right of the rear window (8:1-13). Although

the in-transit stickers were visible, they were hard to read through the car's tinted windows, and he could not tell whether or not they were expired.

Robert Laney testified that he is currently employed by the Omaha Police Department. On June 15, 2010 he was working as a detective in the narcotics unit assigned to surveillance in the area of 50th and L (10:21-25). He first followed a grey Chevy truck that was the target of a controlled purchase involving an individual named Sauceda (11:4-8). Later in the afternoon, Laney was assigned to the surveillance of a silver Jetta Volkswagen (11:11-15). Laney first observed the Jetta in the area of 60th and F in a gas station parking lot where, according to police information, a purchase of methamphetamine had just occurred (11:16-22). Based upon the purchase, a second purchase of methamphetamine was set up for later that afternoon. When Laney arrived at 60th and F, he observed the original grey pickup truck being followed in the parking lot by a silver Jetta. He observed several parties standing outside of the vehicles talking (12:2-7). Laney continued to watch as both the Jetta and the grey pickup truck left the parking lot. As he attempted to follow, he got stuck at a red light and lost the vehicles (12:17-23).

Laney testified that later he heard via police radio transmissions that the Jetta had been stopped. He had no further contact with either the Jetta or the grey pickup truck (13:3-12).

Mark McKenna testified that he is currently employed by the Omaha Police Department as an officer. On June 15, 2010 he was assigned to stop a silver Volkswagen Jetta (16:10-18). McKenna located the Jetta around 60th and L. Other officers advised McKenna by telephone that the vehicle needed to be stopped so the occupants could be

identified and for a check of the in-transits (17:8-13). McKenna observed in-transits on the vehicle, which appeared to have been issued by a dealer (17:14-19). McKenna followed the Jetta and stopped it at approximately 58th and Q. As he approached the Jetta, McKenna ascertained that the in-transits were not expired. He informed the two occupants that they were stopped for a check of in-transits. The driver gave McKenna a copy of a bill of sale and his ID and the passenger produced an ID. McKenna estimated that the stop and contact lasted about 10 minutes during which he filled out a field card (Ex. 101) before allowing the occupants to proceed (19:3-9). The time written on the field card is "1246."

On cross-examination McKenna testified that the field card was filled out on both the front and the back as to both the driver and passenger (20:15-25).

James D. Slosson testified that he is employed as a special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF). On June 15, 2010 he was involved with an operation with Omaha police undercover officers in an attempt to purchase methamphetamine from the individual identified as Sauceda (22:1-22). Slosson noted that on that date two purchases of methamphetamine occurred involving Mr. Sauceda at a parking lot near 50th and L (22:23-25). The first purchase of two ounces of methamphetamine was made by an undercover officer at approximately 12:36 (24:13-20), after which it was determined that a second transaction would be attempted with Sauceda hooking up his methamphetamine source so officers could attempt to identify his drug source. The officers made arrangements for a second buy at the parking lot at 50th and L, and Sauceda indicated that he would be back shortly with an additional ounce (24:23-25:9).

The undercover officer remained in the parking lot at 50th and L. Surveillance officers observed Sauceda as he went to his residence, approximately three or four minutes from 50th and L, and a short time later drive to a gas station at 60th and F where he met the occupants of a silver Jetta (25:10-18). Within seconds, the undercover officer received a call from Sauceda indicating that he was "good to go," in other words, that he would be back at 50th and L shortly (25:15-25). A couple of minutes later Sauceda was observed returning to the parking lot at 50th and L where he met the undercover officer and delivered an additional ounce of methamphetamine (25:25-26:3). No arrests were made on June 15, 2010.

Slosson testified that the investigation continued, and on June 17, 2010 officers conducted two more methamphetamine buys involving Sauceda. A total of four ounces of methamphetamine and a firearm were involved in the buys. The second transaction occurred in a parking lot at 108th and Maple at a Bag 'N Save (26:13-18).

After the second purchase, Sauceda was arrested and was interviewed by Slosson and Majewicz at the office of ATF. Sauceda agreed to cooperate and showed a willingness to contact his drug source (27:3-10). Sauceda told the officers that two of the four ounces that he had delivered that day had come from Jose Maza-Heredia (27:13-25). Sauceda was directed to contact Maza by phone to make arrangements for the delivery of an additional two ounces of methamphetamine (28:1-10). Sauceda made a call and set up a buy at the Bag 'N Save parking lot at 108th and Maple (29:2-5). Sauceda was transported to the parking lot by law enforcement where law enforcement observed two females exit a grey Pontiac parked in the center of the parking lot and approach Sauceda's truck (29:9-24). The two females were stopped by law enforcement and placed under

arrest as was the driver of the Pontiac, who was later identified as the defendant, Francisco Heredia-Barraza (29:25-30:3).

A search of the Pontiac was conducted and two ounces of methamphetamine were discovered in the console area (30:4-9). After Heredia was taken into custody Sauceda identified him as the party who delivered two ounces of methamphetamine to him earlier that day and as the individual Maza described as his brother (30:10-18).

David Rieck testified that he is an Omaha police officer currently assigned to Vice. On June 17, 2010 he was working surveillance in a take-down operation that involved the defendant. While located at the area of 108th and Maple Streets near Bag 'N Save he observed a vehicle with several occupants arrive. After being given the go-ahead to take the vehicle down, he approached and observed the driver make a movement towards the center console (5:9-15). The driver was later identified as Heredia (5:18-23). Heredia was cuffed and placed under arrest and the vehicle was searched. Rieck had no conversations with the defendant and other than transporting him, had no further involvement with the defendant.

Edith Andersen testified that she is currently employed by the Omaha Police Department in the narcotics unit. On June 17, 2010 she was assigned to assist with the interview of Heredia. Andersen testified that she is both Spanish and English speaking and that she is occasionally used by the police department as a Spanish interpreter. Andersen's contact with the defendant occurred at central police headquarters where she used an Omaha Police rights advisory form in the Spanish language to inform Heredia of his rights (Exhibit 1). Andersen took the form into the interview room where the defendant's biographical information was received and placed on the form. The

information included his full name and current address. However, before she could ask additional questions and fill out the rest of the form, the defendant stated, "I've only done this two or three times." (11:17-12:4). Andersen then filled out the remainder of the form, after which the defendant declined to make further statements (13:14-18).

On cross-examination Andersen admitted that during her contact with Heredia she had mentioned that his minor brother was in the next room. Andersen said she did this out of concern for a juvenile being placed into a detention facility; Omaha Police Department policy required that a family member be advised that the minor brother was in custody and was being placed in jail, and defendant's brother had refused to provide a name or phone number (14:19-25).

## II. LEGAL ANALYSIS

### A. Stop of the Volkswagen Jetta on June 15, 2010

The government argues that the officers had probable cause to stop the Volkswagen Jetta on June 15, 2010 for a traffic violation involving the display of in-transit stickers. In the alternative, it is argued that the officers had reasonable suspicion to stop the Jetta to investigate drug trafficking offenses, due to the surveillance officers' observations of the vehicle that day.

A traffic stop constitutes a seizure of the vehicle's occupants, including any passengers. *Brendlin v. California*, 551 U.S. 249, 255-57 (2007).

> A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause. [United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)](#) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). A law enforcement officer has reasonable suspicion when the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts,

reasonably warrant suspicion that a crime is being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir. 1983). The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it. In the context of a traffic stop, "[a]ny traffic violation, however minor, provides probable cause." *United States v. Martinez*, 358 F.3d 1005, 1009 (8th Cir. 2004).

*United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008) (parallel citations omitted). "An otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'" *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008).

### 1. Probable Cause

Any traffic violation, however minor, provides probable cause for a traffic stop. *See, i.e., United States v. Adler*, 590 F.3d 581 (8th Cir. 2009). The traffic violation identified by law enforcement in this case is an improper display of in-transit stickers.

The general rule in Nebraska is that vehicles must display two license plates, one in the front and one in the rear. Neb. Rev. Stat. §§ 60-399(1) & 60-3,100. There is an exception to this requirement for vehicles recently purchased in Nebraska, which may instead display two temporary "In Transit" stickers issued by the motor vehicle dealer. Neb. Rev. Stat. § 60-376. When in-transit stickers are displayed, the person in charge of the vehicle must, "upon demand of proper authorities," present for examination "a duly executed bill of sale therefore or other satisfactory evidence of the right of possession by such person" of the motor vehicle. *Id*.

In this instance, the in-transit stickers readily appeared, by all officers who offered testimony on the matter, to have been issued by a dealer. There is no evidence that the in-transit stickers were improperly displayed. Although one officer noted that it was hard

-8-

to read the in-transit stickers through the car's tinted windows, there is no allegation or evidence that the tinted windows were illegal.

The court finds that the officers did not have an objectively reasonable belief that a traffic violation occurred, and did not have probable cause to stop the Jetta on June 15, 2010.

### 2. Reasonable Suspicion

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002). As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Jones*, 269 F.3d at 924. Under *Terry*, 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The court finds that law enforcement did not reasonably suspect that the Jetta was being operated in a manner that did not comply with Nebraska traffic laws and did not have an objectively reasonable basis to stop the vehicle.

Even assuming that the officers did have reasonable suspicion to believe there was a traffic violation involving the in-transit stickers, a *Terry* stop that is justified at its inception must also be sufficiently limited in scope and duration. *United States v. Ramires*, 307 F.3d 713 (8th Cir. 2002), *cert. denied*, 538 U.S. 1007 (2003). The officer may conduct an

investigation which is "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Jones*, 269 F.3d at 924 (quoting *Terry*, 392 U.S. at 20). Assuming that a suspected traffic violation was the real reason for the stop, all reasonable suspicion was extinguished when Officer McKenna approached the vehicle and immediately ascertained that the in-transit stickers were not expired. Lacking any reason to further detain the occupants of the Jetta, the officer also lacked any legal justification for obtaining the information recorded on the field card.

During oral argument, plaintiff's counsel intimated that the officers had "reasonable suspicion" to stop the Jetta on June 15 due to its use in two drug transactions earlier in the day. (#38, 26:13-27:3). This point was made for the first time at the conclusion of the hearing, was not briefed by the government, and is deemed waived. NECrimR 12.3(c)(2).

### B. Defendant's Arrest on June 17, 2010

Defendant contends he was arrested without probable cause, "based solely upon the direction of [defendant's] recently-arrested codefendant [Gabriel Sauceda], whose credibility had not been tested." (#20, Defendant's Brief at p. 5). As discussed above, Sauceda had been under surveillance for some time and sold methamphetamine to undercover officers twice on June 15, 2010 and twice on June 17, 2010, at which time Sauceda was arrested. Sauceda agreed to cooperate, contacted his drug source (defendant's brother, Jose Maza-Heredia) to arrange for the delivery of two more ounces of methamphetamine, and set up a buy at the Bag 'N Save parking lot. At the appointed time, the defendant appeared in the parking lot driving a grey Pontiac and was arrested after two females exited the Pontiac and approached Sauceda's truck.

"A warrantless arrest in a public place is valid if the arresting officer has probable cause." *United States v. Czeck*, 105 F.3d 1235, 1238 (8th Cir. 1997) (citing *United States v. Watson*, 423 U.S. 411, 418 (1976), and *Payton v. New York*, 445 U.S. 573, 590 (1980) (holding that arrest in suspect's home ordinarily requires warrant)). Probable cause "'exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.'" *United States v. Oropesa*, 316 F.3d 762, 768 (8th Cir. 2003) (quoting *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001), *cert. denied*, 534 U.S. 1116 (2002)). A finding of probable cause encompasses the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 238 (1983), and may be based on the collective knowledge of all officers involved. *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993); *United States v. Aguilera*, 625 F.3d 482, 486 (8th Cir. 2010).

Considering the totality of the circumstances, I find that the officers had probable cause to arrest the defendant on June 17, 2010. After the defendant was arrested, officers searched the Pontiac and found two ounces of methamphetamine in the console area. "Under the automobile exception to the warrant requirement, law enforcement 'may search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'" *United States v. Aguilera*, 625 F.3d at 486; *cf. Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009) ("[C]ircumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"). *See also United States v. Webster*,

625 F.3d 439, 445-46 (8th Cir. 2010), and *United States v. Grooms*, 602 F.3d 939, 942-43 (8th Cir.), *cert. denied*, 131 S. Ct. 491 (2010). In this case, the officers had probable cause to believe that contraband relevant to the crime of arrest was present in the defendant's vehicle.

## C. Defendant's Statement to Law Enforcement on June 17, 2010

The defendant complains generally that law enforcement improperly obtained inculpatory and involuntary statements from him, in violation of *Miranda v. Arizona* and the Fifth and Sixth Amendments to the U.S. Constitution.

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), are triggered when a defendant is (1) in custody and (2) being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

After his arrest, defendant was taken to central police headquarters and informed of his rights by Officer Edith Andersen. While Andersen was asking him for biographical information, the defendant stated, "I've only done this two or three times." (11:17-12:4). Andersen proceeded to complete the rights advisory, and the defendant declined to make further statements. I find that the statement quoted above was volunteered and not the result of "interrogation."

Routine biographical data is exempted from *Miranda*'s coverage. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Finally, the record shows no indication of coercion or police misconduct in talking to the defendant, and the court finds that the defendant's statements were voluntarily made.

### D. Fruit of the Poisonous Tree

Under the "fruit of the poisonous tree" doctrine, evidence that is obtained by the illegal actions of law enforcement officers must be suppressed. *See, e.g., United States v. Torres-Lona*, 2006 WL 3254538 at *12 (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). The evidence obtained on June 17, 2010 was obtained independently, and did not stem from the June 15, 2010 traffic stop. The defendant's request for exclusion under *Wong Sun* should be denied.

### III. RECOMMENDATION

**IT IS RECOMMENDED** that the Motion to Suppress (#19) be granted in part, and denied in part, as follows:

1. The motion should be granted as to evidence obtained during the June 15, 2010 traffic stop of the Volkswagen Jetta.

2. The motion should be denied in all other respects.

A party may object to the magistrate judge's findings and recommendation by filing an "Objection to Magistrate Judge's Findings and Recommendation" within 14 days after being served with the findings and recommendation. The objecting party must comply with all requirements of NECrimR 59.2.

**DATED December 30, 2010.**

                **BY THE COURT:**

                **s/ F.A. Gossett, III**
                **United States Magistrate Judge**